# EXHIBIT A

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

STEEL SUPPLY & ENGINEERING CO.,

    Plaintiff,

v

ILLINOIS NATIONAL INSURANCE CO,

    Defendants.

Case No. 13- O7762 CK B

HON. CHRISTOPHER P. YATES
(P-41017)

---

Gregory G. Timmer (P39396)
Bruce A. Courtade (P41946)
RHOADES MCKEE, P.C.
Attorneys for Plaintiff
161 Ottawa Ave., NW, Ste. 600
Grand Rapids, Michigan 49503
(616) 235-3500

2013 AUG 19 PM 4 25
REC'D & FILED
KENT COUNTY
CIRCUIT COURT

---

## COMPLAINT & JURY DEMAND

THERE IS NO OTHER PENDING OR RESOLVED CIVIL ACTION ARISING OUT OF THE SAME TRANSACTION OR OCCURRENCE ALLEGED IN THE COMPLAINT.

Plaintiff Steel Supply & Engineering Co. ("Steel Supply"), through its attorneys Rhoades McKee, P.C., states as follows for its Complaint against Illinois National Insurance Co ("Illinois National"):

### PARTIES, JURISDICTION, AND VENUE

1.    Steel Supply is a Michigan for-profit corporation doing business in Kent County, Michigan and having its operations facility located at 2020 Newark SE, Grand Rapids, MI 49507.

1

Exhibit A

2.      Defendant Illinois National is a foreign insurance company doing business in Kent County, Michigan through, among other things, the issuance of insurance policies to parties such as Steel Supply.

3.      The amount in controversy exceeds $25,000.00.

4.      This Complaint arises out of the facts and circumstances alleged in a lawsuit filed by the City of Carmel, Indiana, by the Carmel Redevelopment Commission against Steel Supply. The *Carmel* action was assigned Cause No. 29D01-1106-PL-5285 and is presently pending in the Hamilton Superior Court, County of Hamilton, State of Indiana. A copy of the complaint in the *Carmel* action is attached as **Exhibit A**.

5.      Jurisdiction and venue are proper in this Court.

## GENERAL ALLEGATIONS

6.      Plaintiff Steel Supply incorporates by reference the above allegations.

7.      The City of Carmel, through its Redevelopment Commission, commenced a project to build a new performing arts center at the southeast corner of 3rd Avenue and City Center Drive in Carmel, Indiana ("the project").

8.      Shiel Sexton Company, Inc. ("Shiel Sexton") served as Carmel's agent and project manager for the project.

9.      Steel Supply contracted with the City of Carmel to be the structural steel supplier and erector for the project. A copy of the Agreement between the City of Carmel and Steel Supply ("the Agreement") is attached as **Exhibit B.**

10.      Unfortunately, problems developed with the project, and Carmel initiated the *Carmel* action on or about June 6, 2011 alleging that Steel Supply was legally responsible for the damages allegedly sustained by Carmel.

2

11.    In particular, Carmel alleged that Steel Supply was responsible for defects in the

project which were discovered on June 8, 2009, and Carmel alleged:

24.    On or about June 8, 2009, defects were discovered within
the Project. Specifically, a fissure, or rip, in the structural
steel tension ring supporting the dome of the Palladium (the
"Defects") was discovered. The Defects included, but were
not limited to:

a.    a fracture of the column web at the raker beam-to-
tension ring connections;

b.    improper use of bearing bolts in combination with
slotted holes in the direction of axial force at the
raker beam and connections and the tension ring
beam-to-column connections;

c.    improper use of bearing bolts in combination with
slotted holes in the direction of axial force at the
secondary beams used to brace the raker beams
laterally;

d.    improper substitution of a circular compression ring
in lieu of a segmented compression ring as depicted
on the structural drawings; and

e.    eccentricity introduced in the raker beam-tension
ring-column joint due to selection of the work point
at the center of the column. [See attached **Exhibit
A**]

12.    Carmel alleged that, as a result of these alleged defects, the structural integrity of

the project was substantially impacted constituting significant safety concerns and mandating

immediate attention. See *Carmel* Complaint, ¶25 (**Exhibit A**).

13.    Carmel seeks to recover damages which it alleges were caused by the alleged

defects in the project which Carmel articulates in its Complaint as follows:

26.    The Defects compelled the CRC [Carmel] to retain experts
to diagnose the technical deficiencies and to determine the
appropriate processes to remediate the Defects, causing the
CRC to incur substantial expert fees.

3

27. The Defects also required extensive remediation in order to resolve the structural integrity of the Palladium and to provide for the safety of those working within and around the Project and for future patrons to the Project

28. The CRC, through its retained remediation expert, initiated an extensive repair process to remediate the Defects, which caused the scheduled work on the Project to cease and caused the scheduled work to be disrupted and materially impacted the completion of the Project

29. Scheduling conflicts between and among the various trades working on the Project also occurred as a result of the Defects.

30. Various contractors working on the Project put the CRC on notice of claims for damages they allegedly sustained as a result of the Defects (the "Contractor Claims")

31. The CRC has suffered damages in responding to, defending, and settling some of the Contractor Claims.

32. The Defects and the Contractor Claims have caused and will continue to cause the CRC to suffer substantial economic and non-economic damages not yet capable of precise calculation, but which is approximately Five Million and 00/100 Dollars (5,000,000.00).

14. Defendant Illinois National issued a Commercial General Liability Insurance Policy, policy number GL 390-10-97, to Steel Supply with effective dates of coverage from April 1, 2009 to April 1, 2010.

15. Steel Supply timely notified Illinois National of the Carmel Complaint and requested defense and indemnity under the commercial general liability insurance policy issued by Illinois National.

16. Illinois National assumed the defense of the *Carmel* litigation, and upon information and belief, did not issue a reservation of rights letter at that time.

17. On or about April 9, 2012, a new adjuster was assigned to handle the defense of the *Carmel* litigation, and Illinois National, through its authorized representative, Chartis Claims,

4

Inc., sent a reservation of rights under the policy.  Attached as **Exhibit C** is correspondence dated April 9, 2012 from Emma Tortorici to James Polonczyk.  Although the letter refers to a prior reservation of rights letter dated March 2, 2011, Steel Supply has no record of receiving that letter.

18.     On January 22, 2013, Illinois National, through its authorized representative, Chartis Claims, Inc., sent correspondence denying coverage under the policy and advising that it would withdraw its defense of the *Carmel* litigation 30 days from the date of its denial of coverage letter.  Attached as **Exhibit D** is correspondence dated January 22, 2013 from Robert K. Hill to James Polonczyk.

19.     On March 4, 2013, Steel Supply, through its legal counsel, sent a letter to Illinois National requesting reconsideration of its position denying coverage and a duty to defend, and on March 21, 2013, Illinois National, through its authorized representative, responded and reaffirmed its position that no coverage is afforded under the policy.  Copies of these letters are attached as **Exhibits E** and **F**, respectively.

20.     On or about June 10, 2013, Carmel filed a motion for leave to file an amended complaint along with its proposed amended complaint.  Carmel's motion was granted, and a copy of the Amended Complaint is attached as **Exhibit G**.

**COUNT I – BREACH OF CONTRACT AND
DECLARATORY RELIEF REQUESTED.**

21.     Plaintiff incorporates by reference the above allegations.

22.     Steel Supply has paid all premiums due under the Illinois National Commercial General Liability Policy and has otherwise fully performed all conditions precedent to coverage under the policy.

5

23.     The insuring agreement of the Illinois National insurance policy provides in pertinent part as follows:

  a.    We will pay those sums that you become legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies We will have the right and duty to defend you against any suit seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

*  *  *

  b.    This insurance applies to "bodily injury" and "property damage" only if:

    (1)   The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; . . . .

24.     The term "occurrence" is defined by the policy to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

25.     The *Carmel* Complaint alleges that a fissure, or rip, in the structural steel tension ring supporting the dome of the Palladium was discovered, and that this fissure, or rip, was the result of the failures or defects identified in subparagraphs (a) through (e) of paragraph 24.

26.     The dome of the Palladium was in the process of collapsing, causing damage to, among other things, the precast panels that had been affixed to the structural steel supporting and forming the dome.

27.     The withdrawal of the defense and refusal to defend the *Carmel* litigation by Illinois National is a breach of the insurance contract and a breach of Illinois National's duty to defend under the insurance contract. A copy of the Illinois National Commercial General Liability Policy is not attached, but it is in the possession of Illinois National.

WHEREFORE, Steel Supply requests a judgment in its favor and against Illinois National for sums paid by Steel Supply in the defense of the *Carmel* litigation together with

Exhibit A

interest, costs and attorneys fees along with a declaratory judgment providing the following judicial declarations:

    a.   Illinois National has a duty to defend Steel Supply in the Carmel litigation;

    b.   Illinois National has a duty to indemnify Steel Supply from and against any judgment entered against Steel Supply in the Carmel litigation; and

    c.   Grant all other appropriate and equitable relief that the Court deems proper.

Dated: August 19, 2013                    Respectfully submitted,

                                      RHOADES McKEE PC

By:  _____
          Gregory G. Timmer (P39396)
          Bruce A. Courtade (P41946)
          Attorney for Plaintiff Steel Supply
Business Address:
          161 Ottawa Avenue, N.W., Suite 600
          Grand Rapids, MI   49503-2793
          (616) 235-3500

## JURY DEMAND

    NOW COMES the Plaintiff, Steel Supply & Engineering Co., by and through its attorneys, Rhoades McKee PC, and hereby demands a trial by jury in the within cause of action.

                                        RHOADES McKEE PC

By:  _____
          Gregory G. Timmer (P39396)
          Bruce A. Courtade (P41946)
          Attorney for Plaintiff Steel Supply
Business Address:
          161 Ottawa Avenue, N.W., Suite 600
          Grand Rapids, MI   49503-2793
          (616) 235-3500

Exhibit A

·06/07/2011 10:43 FAX         KRIEG DEVAULT         ⌀002

*Received Thursday, June 9,*
*2011*
*@ approx ·1pm*
*Personally delivered and*
*signed for by JTP*
*JTP 6/9/11*

## ALIAS SUMMONS

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE HAMILTON SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF HAMILTON | ) | CAUSE NO. 29D01-1106-PL-5285 |

CITY OF CARMEL, INDIANA, by the )
CARMEL REDEVELOPMENT COMMISSION, )
                         )
       Plaintiff,          )            JUN 07 2011
                         )
       v.                    )
                         )
STEEL SUPPLY & ENGINEERING CO. and )
OHIO FARMERS INSURANCE COMPANY, )
                         )
       Defendants.       )

| | | |
|---|---|---|
| TO DEFENDANT: | (Name) | **STEEL SUPPLY & ENGINEERING CO.** |
| | (Address) | C/O JAMES POLONCZYK |
| | | 5136 CASCADE RD., S.E. SUITE 1-D |
| | | GRAND RAPIDS, MI 49546 |

      You are hereby notified that you have been sued by the entity named as plaintiff in the Court indicated above located at 106 Government & Judicial Center, One Hamilton County Square, Noblesville, IN 46060 telephone no. 776-9630.

      The nature of the suit against you is stated in the Complaint which is attached to this Summons. It also states the relief sought or the demand made against you by the Plaintiff.

      An answer or other appropriate response in writing to the Complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by Plaintiff.

      If you have a claim for relief against the Plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: 6-6-11            *Peggy Beaver*    32
                             Clerk, Hamilton Superior CLERK OF COURTS

(The following manner of Service of Summons is hereby designated.)
  _____   Certified Mail
  _____   Service on Individual at above address
  _____   Service at place of employment:_____
  __X__   Service on agent. (Specify): <u>See Above</u>
  _____   Other service. (Specify)_____

Robert S. Schein, Atty. # 20357-49        Krieg DeVault LLP
Thomas J. Costakis, Atty. # 4314-49      12800 North Meridian Street, Ste. 300
Bryan S. Strawbridge, Atty. # 29076-49    Carmel, IN 46032
                                      (317) 636-4341

Attorneys for Plaintiff

Exhibit A

STATE OF INDIANA        )              IN THE HAMILTON SUPERIOR COURT
                        ) SS:
COUNTY OF HAMILTON )              CAUSE NO. 29D01-1106-PL- 5285

CITY OF CARMEL, INDIANA, by the            )
CARMEL REDEVELOPMENT COMMISSION,  )
                                           )
          Plaintiff,                       )
                                           )
     v.                                    )
                                           )
STEEL SUPPLY & ENGINEERING CO. and         )
OHIO FARMERS INSURANCE COMPANY,            )
                                           )
          Defendants.                      )

## COMPLAINT

Plaintiff, the City of Carmel, Indiana, by and through the Carmel Redevelopment Commission (the "CRC"), by counsel, for its Complaint against Defendants Steel Supply & Engineering Co. ("SSE") and Ohio Farmers Insurance Company (the "Surety") (collectively, the "Defendants"), alleges and states as follows:

### PARTIES

1.     The City of Carmel, Hamilton County, Indiana ("Carmel"), pursuant to Ind. Code § 36-7-14-3, established the CRC as a five-member commission to ensure that all redevelopment projects funded through special benefit taxes would benefit all taxable property within the boundaries of Carmel and would further enhance the development of Carmel.

2.     Pursuant to Ind. Code § 36-7-14-12.2, the CRC has broad powers to, among other things, acquire, hold and develop real property, as well as to retain experts, engineers, architects, surveyors, contractors and legal counsel, and to initiate a civil action in the name of Carmel.

3.     SSE is a corporation organized under the laws of the State of Michigan with an office located in Indianapolis, Indiana.

4.    SSE, among other things, details, fabricates, retrofits and installs structural steel for construction projects.

5.    Upon information and belief, SSE's past projects include stadiums, healthcare facilities, schools, museums, and manufacturing complexes.

6.    The Surety is an Ohio surety bond company, which conducts business in the State of Indiana.

## FACTS COMMON TO ALL COUNTS

7.    The CRC authorized the design and construction of the Regional Performing Arts Center – the Palladium – in Carmel, Indiana (the "Project").

8.    The Project's purpose is to serve as the performance home for several local resident performing arts organizations, to serve as the venue for the finest performing artists from around the world, and to develop an arts education program to interact with the community.

9.    The CRC entered into agreements with numerous prime contractors for completion of various aspects of the Project.

10.    The prime contractor selected by the CRC who was responsible for the fabrication and erection of structural steel on the Project was SSE.

11.    In selecting SSE, the CRC relied upon the knowledge, expertise, and skill of SSE to perform their obligations on the Project.

12.    On or about January 8, 2008, the CRC and SSE entered into an agreement titled Bid Package #3030—Structural Steel, Agreement #2695-3030 (the "Bid Package") for the fabrication and erection of the structural steel on the Project. A true, accurate, and authentic copy of the Bid Package is attached hereto as **Exhibit A**.

2

Exhibit A

13.    Incorporated into the Bid Package is the City of Carmel Standard General Conditions for Construction Contracts (1997) (the "General Conditions") (the Bid Package and the General Conditions collectively are, the "SSE Agreement"). A true, accurate, and authentic copy of the General Conditions is attached hereto as **Exhibit B**.

14.    SSE was required to supervise and direct its work on the Project competently and efficiently, devoting such attention as appropriate and required, while applying its skills and expertise as necessary to perform its work.

15.    SSE was required to design connections and fabricate steel in accordance with the SSE Agreement.

16.    SSE had several and specific obligations regarding the design and fabrication of the structural steel frame connections on the Project.

17.    SSE was responsible for the means, methods, techniques, sequences, and procedures of construction for its obligations on the Project.

18.    SSE was required to furnish and assume full responsibility for all materials, equipment, labor, construction equipment and machinery, tools, services, and incidentals necessary for the furnishing, performance, testing, start-up and completion of its designated work on the Project.

19.    SSE was responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with its work performed on the Project.

20.    SSE was obligated to ensure that any and all work performed by SSE's subcontractors on the Project was undertaken pursuant to an appropriate agreement between SSE and the subcontractors, which specifically bound such subcontractors to the SSE Agreement.

21.    SSE is required to indemnify and hold harmless the CRC from and against all

3

claims, damages, losses, liabilities and expenses, direct, indirect, and consequential, including, but not limited to, fees and charges of engineers, architects, attorneys, and other professionals, court costs, and arbitration costs, arising out of or resulting from SSE's performance of its work on the Project or from the installation, existence, use, maintenance, condition, repairs, alteration or removal of any equipment or material, provided that any such claim, damage, loss, liability or expense is caused in whole or in part by a negligent act or omission of SSE or any subcontractor retained by SSE.

22.    SSE was required to furnish a bond in an amount of at least one hundred percent (100%) of the contract price for SSE's work on the Project.

23.    The Surety provided the bond for SSE's work on the Project (the "Performance Bond"). A true, accurate, and authentic copy of the Performance Bond is attached hereto as **Exhibit C**.

24.    On or about June 8, 2009, defects were discovered within the Project. Specifically, a fissure, or rip, in the structural steel tension ring supporting the dome of the .Palladium (the "Defects") was discovered. The Defects included, but were not limited to:

  a.    a fracture of the column web at the raker beam-to-tension ring connections;

  . b.    improper use of bearing bolts in combination with slotted holes in the direction of axial force at the raker beam end connections and the tension ring beam-to-column connections;

  c.    improper use of bearing bolts in combination with slotted holes in the direction of axial force at the secondary beams used to brace the raker beams laterally;

        d.      improper substitution of a circular compression ring in lieu of a segmented compression ring as depicted on the structural drawings; and

        e.      eccentricity introduced into the raker beam-tension ring-column joint due to selection of the work point at the center of the column.

25.     The Defects substantially impacted the Project's structural integrity and constituted a significant safety concern, which mandated immediate attention.

26.     The Defects compelled the CRC to retain experts to diagnose the technical deficiencies and to determine the appropriate processes to remediate the Defects, causing the CRC to incur substantial expert fees.

27.     The Defects also required extensive remediation in order to resolve the structural integrity of the Palladium and to provide for the safety of those working within and around the Project and for future patrons to the Project.

28.     The CRC, through its retained remediation expert, initiated an extensive repair process to remediate the Defects, which caused the scheduled work on the Project to cease and caused the scheduled work to be disrupted and materially impacted the completion of the Project.

29.     Scheduling conflicts between and among the various trades working on the Project also occurred as a result of the Defects.

30.     Various contractors working on the Project put the CRC on notice of claims for damages they allegedly sustained as a result of the Defects (the "Contractor Claims").

31.     The CRC has suffered damages in responding to, defending, and settling some of the Contractor Claims.

32.     The Defects and the Contractor Claims have caused and will continue to cause the CRC to suffer substantial economic and non-economic damages not yet capable of precise

5

calculation, but which is approximately Five Million and 00/100 Dollars ($5,000,000.00).

33.    Ultimately the remediation and the other aspects of the construction of the Project were completed.

34.    Once completed, the Project has become a lasting and iconic aspect of the Carmel community. It has been heralded as a landmark for listening for its acoustical precision and architectural style and is intended to be a cornerstone of the Carmel community for hundreds of years to come.

## COUNT I
## BREACH OF CONTRACT

35.    The CRC incorporates by reference the previous paragraphs as if fully set forth herein.

36.    The CRC fully performed its obligations under the SSE Agreement and satisfied all conditions precedent required thereby.

37.    SSE is bound to the terms of the SSE Agreement.

38.    SSE breached numerous provisions of the SSE Agreement.

39.    SSE failed to confirm that its work was performed in compliance with the SSE Agreement and relevant regulations.

40.    SSE failed to supervise and direct its work on the Project competently and efficiently.

41.    SSE failed to adequately supervise all safety precautions and programs in connection with its work performed on the Project.

42.    The CRC has suffered damages as a result of the Defects and will suffer additional damages as a result of SSE's numerous breaches and is further entitled to indemnification from SSE for all damages the CRC incurs as a result of SSE's breach.

6

43.    The CRC is entitled to direct, indirect and consequential damages, including, but not limited to, engineers', architects', attorneys' and other professionals' fees incurred in connection with the Defects and the prosecution of this dispute.

WHEREFORE, the CRC prays for a judgment in its favor and against SSE in an amount sufficient to compensate the CRC fully for its damages, including, but not limited to, direct, indirect and consequential damages, engineers', architects', attorneys' and other professionals' fees and for all other proper relief.

## COUNT II
## NEGLIGENCE

44.    The CRC incorporates by reference the previous paragraphs as if fully set forth herein.

45.    SSE owed the CRC a duty to exercise reasonable care in the performance of its work on the Project and to act skillfully, carefully, and in a workmanlike manner.

46.    SSE breached its duty to the CRC to perform construction services on the Project with reasonable care and to act skillfully, carefully, and in a workmanlike manner.

47.    SSE's breaches caused the Defects in the steel structure fabricated, installed or otherwise prepared by SSE.

48.    As a proximate cause of SSE's breaches, the CRC has suffered substantial damages and will suffer additional damages.

WHEREFORE, the CRC prays for a judgment in its favor and against SSE in an amount sufficient to compensate the CRC fully for its damages, including, but not limited to, direct, indirect and consequential damages, engineers', architects', attorneys' and other professionals' fees and for all other proper relief.

7

## COUNT III
## BREACH OF WARRANTY

49.     The CRC incorporates by reference the previous paragraphs as if fully set forth herein.

50.     SSE is liable to the CRC under any and all express and implied warranties that it issued, including, but not limited to, warranties for a particular purpose, warranties of merchantability, any and all statutory warranties, and any all warranties recognized by the SSE Agreement and common law.

51.     SSE breached these warranties as a result of the Defects.

52.     As a proximate cause of SSE's breach, the CRC has suffered substantial damages and will suffer additional damages.

53.     CRC is entitled to damages as a result of SSE's breach of these warranties.

WHEREFORE, the CRC prays for a judgment in its favor and against SSE in an amount sufficient to compensate the CRC fully for its damages, including, but not limited to, direct, indirect and consequential damages, engineers', architects', attorneys' and other professionals' fees and for all other proper relief.

## COUNT IV
## CLAIM FOR PAYMENT BY SURETY

54.     The CRC incorporates by reference the previous paragraphs as if fully set forth herein.

55.     SSE breached numerous provisions of the SSE Agreement.

56.     The CRC fully performed its obligations under the SSE Agreement and the Performance Bond and satisfied all conditions required therein.

8

57. The CRC put SSE and the Surety on notice of the Defects and its claim for indemnity.

58. SSE is liable to the CRC for damages related to SSE's acts or omissions on the Project.

59. SSE has failed to pay the CRC for its damages incurred as a result of SSE's breach of the SSE Agreement.

60. As a result, the CRC is entitled to satisfaction of such damages from the Surety pursuant to the Performance Bond.

WHEREFORE. the CRC prays for a judgment in its favor and against SSE and the Surety in an amount sufficient to compensate the CRC fully for its damages, including, but not limited to, direct, indirect and consequential damages, engineers', architects', attorneys' and other professionals' fees and for all other proper relief.

Respectfully submitted,

Robert S. Schein, Atty. No. 20357-49
KRIEG DeVAULT LLP
12800 North Meridian Street, Ste. 300
Carmel, Indiana 46032
P: (317) 636-4341
F: (317) 636-1507

-and-

Thomas J. Costakis, Atty. No. 4314-49
Bryan S. Strawbridge, Atty. No. 29076-49
KRIEG DeVAULT LLP
One Indiana Square, Suite 2800
Indianapolis, Indiana 46204
P: (317) 636-4341
F: (317) 636-1507

Attorneys for the Plaintiff, City of Carmel, Indiana,
by the Carmel Redevelopment Commission

KD_3437240_3.DOC

10

AGREEMENT
City of Carmel, Indiana
Bid Package #3030 – Structural Steel
Agreement #2695-3830

THIS AGREEMENT is made and entered into by and between the City of Carmel, Indiana, acting by and through its Redevelopment Commission ("OWNER") and Steel Supply & Engineering Co. CONTRACTOR"), concerning the project Carmel Performing Arts Center("Project") described more particularly in Appendix A which is attached hereto and incorporated herein by reference.

RECITALS:

A.  The OWNER has heretofore caused to be prepared certain plans, specifications and other documents (collectively, the "Contract Documents") as hereinafter listed pertaining to the Project, and the CONTRACTOR has filed a bid proposal ("Proposal") to furnish labor, tools, material, equipment and/or services, and to perform the work ("Work") called for in the Contract Documents pertaining to the Project, upon the terms and for the price(s) therein fully stated and set forth; and

B.  The said Contract Documents accurately and fully describe the terms and conditions upon which the CONTRACTOR is willing to furnish the labor, tools, material, equipment, services, and perform the Work called for by the Contract Documents and in the manner and time and for the price(s) set forth therein.

THE OWNER AND CONTRACTOR AGREE AS FOLLOWS:

1.0  Contract Documents

1.1  This Agreement consists of the following Contract Documents all of which are as fully a part of this Agreement as if set out verbatim herein or attached hereto and the same do in all particulars become the Agreement between the parties hereto in all matters and things set forth herein and described:

a.  This Agreement, including any attachments hereto;

b.  All Addenda issued prior to receipt of bid proposals, whether or not receipt thereof has been acknowledged by CONTRACTOR in its Proposal;

c.  The Specifications;

d.  The Additional Requirements;

e.  Notice to Bidders;

f.  Instructions to Bidders;

AR-1 of 7

g.    Plans and Drawings;

h.    Performance, Payment Bonds;

i.    CONTRACTOR'S Proposal and Declarations;

j.    Exhibit 'A' – Pre-award Meeting Minutes/Checklist; and

k.    All other documents defined as Contract Documents in any of the above listed documents.

1.2    In resolving conflicts, errors, discrepancies and disputes concerning the nature, character, scope and/or extent of Work to be performed or furnished by the CONTRACTOR hereunder, or other rights and obligations of the OWNER and/or CONTRACTOR, the provision of a Contract Document expressing the greater quantity, quality or scope of the Work, or imposing a greater obligation upon the CONTRACTOR, or affording a greater right or remedy to OWNER, shall govern, without regard to the party who drafted such provision; otherwise, the Documents shall be given precedence in the order as listed in paragraph 1.1 herein above.

## 2.0    Contract Price

2.1    The CONTRACTOR shall, in strict conformity with the Contract Documents, furnish all necessary labor, tools, materials, equipment, services, assume and fulfill all obligations and perform all Work required to construct, complete, and make ready for use by the OWNER for a total contract price of $ 9,923,000.00 Base Bid, subject to any additions or deletions based on actual approved quantities of the respective unit price items, which price the CONTRACTOR agrees to accept as full payment for all such Work actually performed and accepted as described in the Contract Documents (the "Contract Price"). The CONTRACTOR agrees that the Contract Price shall be deemed full and complete compensation for all direct and indirect costs the Work, including, without limitation, all materials, labor, supervision, equipment, transportation, warranties, repairs, replacement, overhead and profit, complete and in place.

2.2    The above stated Contract Price will be paid to the CONTRACTOR in the manner and at such times as set forth in the Contract Documents.

## 3.0    Contract Time

3.1    It is hereby understood and mutually agreed, by and between the CONTRACTOR and OWNER, that the date of commencement and the time for completion of the Work as specified in the Contract Documents are essential conditions of this Agreement.

3.2    The CONTRACTOR agrees that the Work shall be commenced no later than the date indicated in the Notice to Proceed to be provided by OWNER to CONTRACTOR and that the Work shall be performed regularly, diligently and without interruption at such a rate of progress as will insure "Substantial Completion" of the Project, including completion of performance testing and such remedial work as may be required by the OWNER, by the dates specified in the Contract Documents.

3.3     The CONTRACTOR and OWNER acknowledge and agree that the time allotted by this Agreement for the performance and completion of the Work is reasonable and takes into account any and all risks and adverse conditions which may befall the CONTRACTOR hereunder.

4.      Effective Date

This Agreement shall be deemed effective as of the date and year on which the last of the parties hereto, or their representative, executes same.

5.      Miscellaneous Provisions

5.1     OWNER's Property

Any and all documentation (other than original tracings and original calculations) generated by CONTRACTOR pursuant to this Agreement shall be considered OWNER's exclusive property and shall be disclosed only to OWNER and to no other person without OWNER's prior express written consent.  CONTRACTOR shall keep confidential all working and deliberative material pursuant to IC 5-14-3-4.

5.2     Termination

Except as expressly stated to the contrary herein, this Agreement may be suspended and/or terminated upon such terms as are set forth in Article 14 of the City of Carmel, Standard General Conditions for Construction Contracts 1997 (the "General Conditions"), as incorporated herein by this reference.

In the event any amount allegedly due hereunder is disputed and such dispute is not resolved to OWNER's satisfaction within ten (10) business days after notice of such dispute is given to CONTRACTOR, OWNER shall pay such amount as is in dispute, under protest, into the City Court of Carmel, which Court shall hold such money until notified of a resolution signed by both parties hereto or until a final judgment is entered thereon.

5.3     Binding Effect

OWNER and CONTRACTOR and their respective officers, officials, partners, successors, executors, administrators, assigns and legal representatives are bound by this Agreement to the other party hereto and to the officers, officials, partners, successors, executors, administrators, assigns and legal representatives of such other party in all respects as to all covenants, agreements and obligations contained and/or incorporated herein.

5.4     No Third Party Beneficiaries

Nothing contained herein shall be construed to give any rights or benefits hereunder to anyone other than OWNER or CONTRACTOR.

5.5     Relationship

The relationship of the parties hereto shall be as provided for in this Agreement, and CONTRACTOR, as well as its agents, employees, contractors, subcontractors, outside sources and other persons shall in no fashion be deemed to be an employee of OWNER. Furthermore, CONTRACTOR shall be solely responsible for payment to or for its agents, employees, contractors, subcontractors, outside sources and other persons all statutory, contractual and other compensation, benefits and obligations due thereto, and OWNER shall not be responsible for same. Rather, the Contract Price to be paid hereunder by OWNER to CONTRACTOR shall, subject to the terms and conditions hereof, be the full and maximum compensation and monies required of OWNER to be paid to CONTRACTOR pursuant to this Agreement.

5.6     Insurance

CONTRACTOR shall maintain such bonds and insurance as are set forth in Article 5 of the General Conditions.

5.7     Indemnification

CONTRACTOR shall indemnify and hold harmless OWNER, its officers, officials, employees, agents and legal representatives, from all losses, liabilities, claims, judgments and liens, including, but not limited to, all costs, expenses and attorney fees, arising out of any intentional or negligent act or omission of CONTRACTOR and/or any of its agents, employees, contractors, subcontractors, outside sources and/or other persons in the performance of this Agreement. The failure to do so shall constitute a material breach of this Agreement. This indemnification obligation shall survive the termination of this Agreement.

5.8     Setoff

In addition to any right of setoff provided by law, all amounts due CONTRACTOR shall be considered net of indebtedness of CONTRACTOR to OWNER, and OWNER may deduct any amounts due or to be come due from CONTRACTOR to OWNER from any sums due or to become due from OWNER to CONTRACTOR hereunder.

5.9     Government Compliance

CONTRACTOR agrees to comply with all present and future federal, state and local laws, executive orders, rules, regulations, codes and ordinances which may be applicable to CONTRACTOR's performance of its obligations under this Agreement, and all relevant provisions thereof are incorporated herein by this reference. CONTRACTOR agrees to indemnify and hold harmless OWNER from any loss, damage or liability resulting from any violation of such laws, orders, rules, regulations, codes and/or ordinances. This indemnification obligation shall survive the termination of this Agreement.

5.10    Severability.

If any provision of this Agreement is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, that provision shall be stricken, and all other

AR-4 of 7

Exhibit A

provisions of this Agreement which can operate independently of such stricken provision shall continue in full force and effect.

5.11    Notice.

Any notice, invoice, order or other correspondence required or permitted to be sent under or pursuant to this Agreement shall be in writing and either hand-delivered or sent by postage prepaid, U.S. Certified mail, return receipt requested, addressed to the parties at the following address:

OWNER:                                                   CONTRACTOR:

City of Carmel                                          Steel Supply & Engineering Co.
Redevelopment Commission                               2902 N. Tobey Dr.
One Civic Square                                       Indianapolis, IN 46219
Carmel, IN 46032                                       Attn: General Manager
Attention: Les Olds, AIA, Director of Redevelopment
Carmel Redevelopment Commission
(with a copy to City Attorney, Construction Manager,
Department of Law, same address)

Notwithstanding the above, a Notice To Cease All Work issued under or pursuit to Paragraph 5.2 hereinabove may be orally given, as long as such notice is thereafter followed by written notice as provided in this Paragraph 5.11 within five (5) business days of the date of such oral notice.

5.12    Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of Indiana, except for its conflict of laws provisions, as well as with all municipal ordinances and codes of the City of Carmel. The parties further agree that, in the event a lawsuit is filed hereunder, they waive any rights to a jury trial they may have, agree to file any such lawsuit in an appropriate court in Hamilton County, Indiana only, and agree that such court is the appropriate venue for and has jurisdiction over same.

5.13    Waiver

Any delay or partial inaction on the part of OWNER in exercising or pursuing any right and/or remedy provided hereunder or by law shall not operate to waive any such rights or remedies.

5.14    Exhibits

All exhibits and/or appendices referenced herein, whether marked "Exhibit", "Appendix", or by some other title, shall be considered a part of this Agreement.

5.15    Prior Agreements

Exhibit A

This Agreement contains all of the agreements of the parties hereto with respect to the subject matter hereof, and supersedes all prior negotiations, representations, and/or contracts, either oral or written, respective thereto.

5.16    Representation and Warranties

Each party hereto represents and warrants that it is authorized to enter into this Agreement and that such party, in executing this Agreement, has the authority to bind such party or the party which it represents, as the case may be.

5.17    Headings

All headings and sections of this Agreement are inserted for convenience only and do not form a part of this Agreement nor limit, expand or otherwise alter the meaning of any provisions hereof.

5.18    Advice of Counsel

The parties warrant that they have read this Agreement and understand it, are fully aware of their respective rights, have had the opportunity for the advice and assistance of an attorney throughout the negotiation of this Agreement, and enter into this Agreement freely, voluntarily and without any duress, undue influence, coercion or promise of benefit, except as expressly set forth herein.

5.19    Entire Agreement

This Agreement, together with any attachments hereto or referenced herein, constitutes the entire agreement between Vendor and City with respect to the subject matter hereof, and supersedes all prior oral or written representations and agreements regarding same. Notwithstanding any other term or condition set forth herein, but subject to paragraph 5.10 hereof, to the extent any term or condition contained in any exhibit attached to this Agreement conflicts with any term or condition contained in this Agreement, the term or condition contained in this Agreement shall govern and prevail, unless the parties hereto, or their successors in interest, expressly and in writing agree otherwise. This Agreement may only be modified by written amendment executed by both parties hereto, or their successors in interest.

IN WITNESS WHEREOF, the parties hereto set their hand on the dates below written:

OWNER:
CITY OF CARMEL, INDIANA
by and through its Redevelopment
Commission

BY: _____
    Ronald A. Carter, President

CONTRACTOR:

Steel Supply & Engineering Co.

BY: _____

Printed Name:   R. J. Dean

Title:   Chief Executive Officer

AR-6 of 7

Date: _____          Date: January 8, 2008

AR-7 of 7

**Emma Tortorici**
Claims Specialist III
Construction Defect Claims
925-901-2563 Telephone
866-252-2245 Facsimile
Emma.Tortorici@chartisinsurance.com



April 9, 2012

**VIA EMAIL ONLY**

Mr. James Polonczyk
CFO & General Counsel
The Armada Group, Inc.
jpolonczyk@the-armada-group.com

RE:   City of Carmel, Indiana, by the Carmel Redevelopment Commission v. Steel Supply &
Engineering Co. and Ohio Farmers Insurance Co., et al.

|              |                                   |
|--------------|-----------------------------------|
| Insured:     | Armada Group Inc.                 |
|              | Steel Supply & Engineering Co.    |
| Policy:      | GL 390-10-97 (04/01/07-04/01/08)  |
|              | GL 390-10-97 (04/01/08-04/01/09)  |
|              | GL 390-10-97 (04/01/09- 04/01/10) |
|              | GL 390-10-97 (04/01/10-04/01/11)  |
| Claim No.:   | 302-021754                        |

Dear Mr. Polonczyk:

Chartis Claims Inc. (formerly known as AIG Domestic Claims, Inc.), a member company of
Chartis Inc., is the authorized representative of Illinois National Insurance Company ("Illinois
National") which issued the above referenced policies to Armada Group, Inc. ("Armada").
Please be advised that I am the adjuster handling this claim and all future correspondence
should be directed to my attention.  The purpose of this letter is to advise you of our position
with respect to coverage for the subject claim.

As you are aware, Illinois National has been investigating the allegations by the City of Carmel
with respect to the construction of the Performing Arts Center.  By correspondence dated March
2, 2011 a reservation of rights was issued regarding coverage for this matter based on the
information provided at that time.  Since then, we have been asked to reevaluate coverage
based on a recently provided Complaint filed by the City of Carmel.

We have determined that Illinois National will provide a defense *subject to reservation of
rights*.  The defense will be administered within policy GL 390-10-97 effective 04/01/09-
04/01/10, however, Illinois National respectfully declines coverage under the policies effective
04/01/07-04/01/09, as further discussed below.

April 9, 2012
Page 2

It is our understanding that you have retained the law firm of Kightlinger Gray to represent your interests in this matter. The claim is being administered through TPA, Kenneth Flowers with Sedgwick CMS who has contacted the undersigned as well as defense counsel, Steven Springer. Please contact Kenneth at 312-356-1916 for the administration of this claim.

In considering your request for coverage, we have carefully reviewed the insurance policies referenced above, as well as the allegations asserted. No other policies were considered. If you assert a right to coverage under another policy issued by any other member company of Chartis, Inc., please submit notice pursuant to the notice provisions contained in that policy.

Based on the information we have received to date, the following sets forth a summary of the allegations and other pertinent information.

According to the defense reports from Sullivan Ward that we have received to date, Steel Supply & Engineering Co. ("SSE") contracted with Sofco Erectors, Inc., ("Sofco") to perform the erection and structural fabrication of the City of Carmel Regional Performing Arts Center ("PAC"). The PAC was designed to have three roofs and the highest is a round doom with an oculus in the center of it that acts as a skylight. Creviston Engineering Inc. prepared the drawings for the steel pieces which were to make up the roofing components. SSE fabricated these components based on the drawings. On or about June 8, 2009, one of the iron workers noted that one of the steel webs had separated and failed and SSE was advised of the problem. SSE hired an engineering firm, Ruby & Associates, to investigate the problem. It was determined by David Ruby of Ruby & Associates, Inc. on June 16, 2009 that the cause of the problem was an error in the design of the dome compression ring:

> "The tension ring has been breached and column web has fractured at Z15 and Z7. The stability of the structure depends on the structural integrity of the compression ring and the tension ring. "

The City retained its own forensic engineer, Walter P. Moore and work was halted for two months to allow him to prepare a solution. On August 21, 2009, the project engineer, Lynch, Harrison & Brumleve issued a letter stating the building was safe to resume construction and, as of October 7, 2009, further connection details were issued for the stabilization of the dome. The dome apparently has been stabilized and we understand the Performing Arts Center is in operation. The City now seeks to recover the extra work and costs incurred to stabilize the dome, damages due to delay, and possible future costs to tear down and replace the dome with a stronger structure.

The parties attempted to cooperate with each other and mediate this matter before formal litigation was filed. This approach was unsuccessful in resolving the issues and in June 2011 a Complaint was filed in Hamilton Superior Court by the City of Carmel, Indiana against SSE and Ohio Farmers Insurance Company. The Complaint asserts that certain defects were discovered relating to the structural steel tension ring supporting the dome. These defects include,

> "fracture of the column web at the raker beam-to-tension ring connections; improper use of bearing bolts in combination with slotted holes in the direction of axial force at the raker beam end connections and the tension ring beam-to column connections; and improper use of bearing bolts in combination with slotted holes in the direction of axial

April 9, 2012
Page 3

force at the secondary beams used to brace the raker beams laterally; improper substitution of a circular compression ring in lieu of a segmented compression ring as depicted on the structural drawings; and eccentricity introduced into the raker beam-tension ring column joint due to selection of the work point at the center of the column."

The claimed defects are alleged to have impacted the project's structural integrity and caused safety concerns, resulting in costly repairs and delays to the project. The Complaint asserts causes of action for Breach of Contract, Negligence, Breach of Warranty and Payment by Surety

Illinois National Insurance Company issued Commercial General Liability insurance policies number GL 390-10-97 effective for the periods of 04/01/07-04/01/11. Each of the policy periods has a $2,000,000 products completed operations aggregate and are subject to a $1,000,000 per occurrence limit. The policy effective 04/01/10-04/01/11 contains an endorsement modifying the policy limits and including a $2,000,000 per project general aggregate limit. Pursuant to endorsement, the named insureds include any entity which the insured has more than a 50% ownership interest in or exercises management or financial control. It is our understanding that Steel Supply & Engineering is a subsidiary of Armada and therefore a Named Insured on the policies.

**Attached to this letter are the relevant policy provisions for convenient review.** Kindly refer to the policies for the complete terms and conditions.

As noted above, Illinois National accepts defense subject to reservation of rights for SSE under policy GL 390-10-97 effective 04/01/09-04/01/10.  Illinois National respectfully declines to defend or indemnify SSE under policies GL 390-10-97 effective 04/01/07-04/01/09 and (04/01/10-04/01/11).

The Insuring Agreement of the policies provides coverage only for "property damage" that occurs during the policy period. It is our understanding that during the construction in June 2009 a worker noticed a failure in the structure, a fracture of the column web at the raker beam to tension ring connections. Illinois National's duty to defend SSE under any given policy is dependent upon the potential for covered damages within the policy. Based upon the dates of contracting, and construction, there could not have been an occurrence during the earlier policies with effective dates of 04/01/07-04/01/09.  Therefore, Illinois National respectfully declines coverage under the policies effective 04/01/07-04/01/09.

Further, the Insuring Agreement provides that coverage applies to an occurrence of "property damage" only if, prior to the policy period, no insured and no authorized employee of an insured knew that the "property damage" had occurred in whole or part.  Here, SSE was advised of the fracture on June 8, 2009. Therefore, the property damage was known prior to the inception of policy GL 390-10-97 (04/01/10-04/01/11).  Coverage is respectfully declined under the 2010-11 policy on this ground.

As previously stated in the March 2, 2011 reservation of rights, the policies provide coverage only for "property damage" that occurs during the policy period and that is caused by an "occurrence."  The Complaint filed by the City of Carmel very broadly states that they are seeking the damages for the repair to the structure due to defects in the steel structure and all

April 9, 2012
Page 4

other property damaged as a result of construction defect. The existence of a defect in the structure, by itself, does not constitute an "occurrence" of "property damage". "Property damage" requires a physical change in condition, some damage resulting from an alleged defect. Here, the Complaint also states that that the City of Carmel is seeking damages for repair and replacement of the SSE product. However, the policy Exclusions j. (5); j. (6); k.; l.; m. and n. may apply to preclude coverage for this matter, in whole or part.

Exclusions j. (5) and j. (6) precludes coverage for damage to real or other property on which SSE or any contractor or subcontractor working on its behalf is performing operations, or that part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. Illinois National reserves the right to limit or deny coverage based on this exclusion.

Exclusion k. precludes coverage for "property damage" to SSE's products. Illinois National reserves the right preclude coverage to SSE for any alleged "property damage" to its products.

Exclusion l. precludes coverage for "property damage" to SSE's work. Illinois National reserves the right to deny coverage for alleged "property damage" to SSE's work.

Exclusion m. precludes coverage for damage to "impaired property" or property which is not physically injured but which cannot be used due to SSE's' defective work. Therefore, Illinois National reserves the right to deny coverage for any alleged damage to property which cannot be used due to defective work.

Exclusion n. precludes coverage for damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of ; "Your product"; "Your work"; or "impaired property", if the product, work or property is withdrawn from use because of a known or suspected defect in it.

We are continuing to investigate the facts, subject to a reservation of rights. However, at the present time it appears the insuring agreement and exclusions above may preclude coverage for a large part of the claimed damage.

In addition, there are several other provisions of the policies that may also serve as a further basis for our coverage declination in this matter.

Please be advised that claims for breach of contract, breach of warranty, and declaratory relief which result in economic losses may not satisfy the definitions of "occurrence" or "property damage." There would be no coverage if the claim does not involve "property damage" caused by an "occurrence."

Please also be advised that our defense obligation is limited to the reimbursement of defense fees at hourly rates which are reasonable and customary for defense counsel in the same jurisdiction involving the same or similar litigation.

Illinois National is reserving its rights based upon the above referenced policy provisions. These rights include the right to defend, file a declaratory relief action, seek recovery of any costs expended in defense or settlement, and withdraw the defense at any time if appropriate.

April 9, 2012
Page 5

Illinois National's coverage position is based on the information presently available to us. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other policy provisions, or any other insurance policies issued by Illinois National or any of its affiliates. Illinois National expressly reserves all its rights under the policies captioned above, including the right to assert additional defenses to any claims for coverage, if subsequent information indicates that such action is warranted.

Should you have any additional information that you feel would cause us to review our position, or would assist us in our investigation or determination, please advise the undersigned as soon as possible. Also, if you are served with any additional demands or amended pleadings, please forward them to me immediately so that we can review our coverage position.

There may be coverage for this matter under other insurers' policies, whether directly, or by way of additional insured endorsement. In particular, Builder's Risk coverage for the Performing Arts center project may apply. Accordingly, we ask that you please provide the undersigned with the identities of all other potentially applicable policies, and that you cooperate with us in notifying these carriers immediately.

If you have any other insurance policies which may respond to this claim, you should notify those carriers.

In closing, I encourage you to contact me should you have any questions or concerns regarding the contents of this letter. Thank you for your cooperation in this matter.

Very truly yours,

*/S/ Emma M. Tortorici*
Emma M. Tortorici
Claim Specialist III

cc:     Kenneth Flowers (via email only)
        Sedgwick CMS
        Kenneth.flowers@sedgwickcms.com

Exhibit A

April 9, 2012
Page 6

## PERTINENT POLICY PROVISIONS

The insuring agreement of the policies states in pertinent part:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

**SECTION I - COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

    **1. Insuring Agreement**

    a.    **We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" for which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result but,**

        **(1) The amount we will pay for damages is limited as described in SECTION III - LIMITS OF INSURANCE; and**

        **(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.**

        **No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.**

    **b. This insurance applies to "bodily injury" and "property damage" only if:**

        **(1) The "bodily injury" or "property damage" is caused by an "occurrence" that take place in the "coverage territory;" and**

        **(2) The "bodily injury" or "property damage" occurs during the policy period.**

        **(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" has occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during**

April 9, 2012
Page 7

or after the policy period will be deemed to have been known prior to the policy period.

c.    "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d.    "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

        (1)    Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;
        (2)    Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or
        (3)    Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

## 2. Exclusions

This insurance does not apply to:

j.    Damage to Property

    "Property damage" to:

    (1)    Property you own rent or occupy including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

    (5)    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

    (6)    That particular part of property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

    Paragraphs (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

k.  **Damage to Your Product**
    "Property damage" to "your product" arising out of it or any part of it.

l.  **Damage to Your Work**
    "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

    This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m.  **Damage to Impaired Property or Property Not Physically Injured**
    "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

    (1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
    (2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n.  **Recall of Products, Work or Impaired Property**
    Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

    (1)    "Your product;"
    (2)    "Your work;" or
    (3)    "Impaired property;"

    if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

The policies contain various definitions that affect coverage. We provide you with the following pertinent definitions.

**SECTION V – DEFINITIONS**

7. "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work;" or

b. Your fulfilling the terms of the contract or agreement.

12. "Occurrence" means an accident including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed;

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

Exhibit A

April 9, 2012
Page 10

        (2) The existence of tools, uninstalled equipment or abandoned or unused materials;

        (3) Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations;

15. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

18. "Your product" means:

    a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        (1) You;

        (2) Others trading under your name, or

        (3) A person or organization whose business or assets you have acquired, and

    b. Containers (other than vehicles), materials, parts or equipment, furnished In connection with such goods or products.

    "Your product" includes:

    a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

    b. The providing of or failure to provide warnings or instructions.

    "Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

19. "Your work" means:

    a. Work or operations performed by you or on your behalf; and

    b. Materials, parts or equipment furnished in connection with such work or operations.

Exhibit A

April 9, 2012
Page 11

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

b. The providing of or failure to provide warnings or instructions.

Exhibit A



AIG Property Casualty
Complex Casualty Claims
PO Box 3780
Alpharetta, GA 30023
www.aig.com

Robert K. Hill
COMPLEX DIRECTOR
T 925 901 2213
F 866 270 7545
Robert.Hill2@AIG.com

January 22, 2013

**VIA EMAIL ONLY**

Mr. James Polonczyk
CFO & General Counsel
The Armada Group, Inc.
jpolonczyk@the-armada-group.com

RE:     *City of Carmel, IN v. Steel Supply & Engineering Co., et al.*

       Insured:     Armada Group Inc. / Steel Supply & Engineering Co.
       Policy:      GL 390-10-97 (04/01/09 – 04/01/10)
       Claim No.   302-021754

Dear Mr. Polonczyk:

As you are aware, Chartis Claims Inc. (formerly known as AIG Domestic Claims, Inc.), a member company of Chartis Inc., is the authorized representative of Illinois National Insurance Company ("Illinois National") which issued Policy No. GL 390-10-97 for the April 1, 2009 to April 1, 2010 period period (the "Policy") to the Armada Group Inc. ("Armada"). It is our understanding that Steel Supply & Engineering Co. ("SSE") is a subsidiary of Armada, and therefore a Named Insured under the Policy. As you know, Illinois National has been funding SSE's defense in this matter under a full reservation of rights.

We have concluded our coverage investigation of this matter, after carefully reviewing the insurance policies issued to Armada, the allegations in the subject complaint, all the documents and reports provided by your counsel, as well as the information provided by you on January 14, 2013 during your telephone conference with Illinois National's coverage counsel, Bryan Schumann of Lewis Brisbois Bisgaard & Smith LLP. At this time, Illinois National must respectfully deny coverage for this matter under the Policy for the reasons discussed below. (As advised in our April 5, 2012 correspondence, there is also no coverage for this matter under Policy No. 390-10-97 for the April 1, 2007 through April 1, 2009 and April 1, 2010 through April 2011 policy periods.)

Page 1 of 10
January 22, 2013

Exhibit A



Based on the information we have received to date, the following sets forth a summary of the allegations and other pertinent information. According to defense counsel's reports, SSE contracted with Sofco Erectors, Inc., ("Sofco") to perform the erection and fabrication of the steel for the City of Carmel Regional Performing Arts Center (the "Palladium"). The Palladium was designed to include a round dome with an oculus in the center. Creviston Engineering Inc. prepared the drawings for the steel pieces which were to make up the roofing components and SSE fabricated the components based on the drawings. On June 8, 2009, one of the iron workers noticed that one of the steel webs had failed, and it was subsequently determined that a second steel web had also failed. SSE was advised of the problem and hired Ruby & Associates, Inc., an engineering firm, to investigate the problem. Ruby & Associates concluded that the problem was caused by an error in the design of the compression ring. The City of Carmel retained a forensic engineering firm, Walter P. Moore ("WPM"). While WPM prepared a solution for the problem, work was halted for two months. On October 7, 2009, further connection details were issued for stabilizing the dome, and these stabilization techniques were implemented to the connections of the steel structure.

The City of Carmel now seeks to recover the extra work costs incurred to stabilize the dome, damages due to delay, and possible "future costs" to tear down and replace the dome with a stronger structure. The parties attempted to mediate the matter before formal litigation was commenced, but those efforts were unsuccessful. In June, 2011, a Complaint was filed against SSE and Ohio Farmers Insurance Company (the "underlying litigation") The defects alleged in the Complaint are said to have impacted the project's structural integrity and caused safety concerns, resulting in costly repairs and delay in the completion of the project. The Complaint asserts causes of action for Breach of Contract, Negligence, Breach of Warranty and Payment by Surety.

**Attached to this letter are the relevant Policy provisions for convenient review.** Kindly refer to the Policy for the complete terms and conditions. As noted above, Illinois National must respectfully deny coverage for the this matter under the Policy for the following reasons.

The Insuring Agreement of the Policy provides coverage for "property damage" only if it is caused by an "occurrence." Based the facts provided to us, the alleged injuries to the steel were not caused by an "occurrence" as defined under the Policy. Therefore, all of the alleged "property damage" to the steel did not arise out of any "occurrence."

Page 2 of 10
January 22, 2013

Exhibit A



Thus, the alleged remediation costs for the steel and any alleged consequential damages not covered under the Insuring Agreement of the Policy.

Also, to the degree that there could be any "occurrence," several exclusions would then apply. First, Exclusion j(5) of the Policy precludes coverage for "property damage" to "that part of real property on which you or any contractors or subcontractors... are performing operations, if the "property damage" arises out of those operations." In the present case, SSE and its subcontractors were performing operations at the Palladium through their fabrication and erection of the structural steel for the Palladium dome components. The Claimant alleges that any "property damage" which subsequently resulted arose directly out of SSE's work at the Palladium. Therefore, as all the "property damage" arose out of SSE and its subcontractor's operations at the Palladium, Illinois National must deny coverage for all claims as currently pled in the underlying litigation pursuant to Exclusion j(5) of the Policy.

Moreover, Exclusion k of the Policy excludes coverage for "property damage" to "your product." All of the allegations of physical injuries to the structural steel at the Palladium constitute allegations of "property damage" to "your product." Thus, Illinois National must deny coverage for any "property damage" to the structural steel at the Palladium.

In addition, Exclusion j(6) of the Policy precludes coverage for property that must be restored, repaired or replaced because "your work" was incorrectly performed on it, with the exception that it does not apply to "property damage" included in the "products-completed operations hazard." The Complaint alleges that "property damage" occurred and remediation efforts took place because of SSE's incorrectly performed work at the Palladium. You advised Mr. Schumann on January 14, 2013 that SSE was not entirely finished with its work at the time the alleged injuries were discovered. To the extent that SSE's work at the Palladium was incomplete at the time of the property damage, Illinois National must deny coverage for all "property damage" associated with "your work" pursuant to Exclusion j(6) of the Policy.

Alternatively, Exclusion l of the Policy excludes coverage for "property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". Thus, to the extent that "your work" at the Palladium was in fact complete at the time of the "property damage", Illinois National must deny coverage for "property damage" to all the steel at the Palladium pursuant to Exclusion l of the Policy.

Exhibit A



In addition, there may be other provisions in the Policy that serve as additional bases for Illinois National's coverage declination in this matter. Illinois National continues to reserve its rights with respect to any other potential coverage defenses under the Policy and applicable law.

As Illinois National is presently funding SSE's defense in the underlying litigation, and as Illinois National must now deny coverage pursuant to the reasons discussed herein, Illinois National will be withdrawing its funding of SSE's defense in this matter; Illinois National will continue to pay for SSE's defense for the next 30 days. SSE must then pay for any defense costs incurred after that.

Further, as there is no coverage for this matter under the Policy, Illinois National will not be paying any amounts towards any settlement of this matter reached during any mediation, and will not indemnify SSE for any judgments entered against it.

Illinois National's coverage position is based on the information presently available to us. This letter is not and should not be construed as a waiver of any terms, conditions, exclusions or other policy provisions, or any other potential coverage defenses Illinois National may have under the Policy. Should SSE have any additional information that it believes will cause Illinois National to review its position, please advise the undersigned as soon as possible. Additionally, in the event that an amended complaint is filed in this matter in the future which SSE believes may trigger coverage, please forward it to Illinois National for consideration.

There may be coverage for this matter under other insurers' policies, whether directly or by way of additional insured endorsement. Accordingly, we recommend that you notify these carriers immediately of this matter.

In closing, I encourage you to contact me should you have any questions or concerns regarding the contents of this letter. Thank you for your cooperation in this matter.

Exhibit A



Very truly yours,

AIG Claims Inc

for Ilinois National Insurance Company

*Robert Hill*

Auto signature

Robert Hill

Complex Director

E-mail: Robert.Hill2@aig.com

Cc:    Bryan Schumann, Esq. (via email)
         Steven Springer, Esq. (via email)
         Pfenne Cantrell, Esq. (via email)

Page 5 of 10
January 22, 2013

Exhibit A



<u>PERTINENT POLICY PROVISIONS</u>

**SECTION I - COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.  **Insuring Agreement**

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result...

    b.  This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2) The "bodily injury" or "property damage" occurs during the policy period; and

        (3) Prior to the policy period, no insured... knew that the "bodily injury" or property damage" had occurred, in whole or in part...

2.  **EXCLUSIONS**

    This insurance does not apply to:

    j.  **Damage to Property**

        "Property damage" to:

        (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

Page 6 of 10
January 22, 2013

Exhibit A



(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it;

...Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

## SECTION V – DEFINITIONS

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

16. "Products-completed operations hazard"

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that ha snot yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

Exhibit A



    (c)    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b.    Does not include "bodily injury" or "property damage" arising out of:

    (1)    The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    (2)    The existence of tools, uninstalled equipment or abandoned or unused materials; or

    (3)    Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17.    "Property damage" means:

a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.



21. "Your product"

    a. Means:

        (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            (a) You

            (b) Others trading under your name; or

            (c) A person or organization whose business or assets you have acquired; and

        (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    b. Includes:

        (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

        (2) The providing of or failure to provide warnings or instructions...

    c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

    a. Means:

        (1) Work or operations performed by you or on your behalf; and

        (2) Materials, parts or equipment furnished in connection with such work or operations.

    b Includes:

        (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and



    (2)    The providing of or failure to provide warnings or instructions.

Exhibit A

EDWARD B. GOODRICH
RICHARD G. LEONARD
BRUCE W. NECKERS
THOMAS P. HOGAN
MARY ANN CARTWRIGHT
THOMAS L. SAXE
JAMES L. SCHIPPER
LAURIE M. STRONG
GREGORY G. TIMMER
SCOTT J. STEINER
DOUGLAS P. VANDEN BERGE
ROBERT C. SHAVER
JOHN M. LICHTENBERG
MARK E. FATUM
DAN E. BYLENGA, JR.
PAUL A. MCCARTHY
RANDY J. KOLAR
MICHAEL C. WALTON
BRUCE A. COURTADE
PETER J. LOZICKI
TODD A. HENDRICKS
MARTIN W. BUSCHLE
TERRY L. ZABEL
MARY JANE RHOADES
DAVID E. BEVINS
PATRICK R. DRUEKE
MARY L. TABIN
PAMELA J. CROSS

# Rhoades McKee PC

*attorneys & counselors*

ANTHONY A. PEARSON
ROBERT C. RUTGERS, JR.
JOHN T. KLEES
BRIAN K. LAWSON
HAROLD E. NELSON
MARK R. SMITH
EMILY A. GREEN
THOMAS S. FLICKINGER
STEPHEN J. HULST
JAMES R. POLL
ALLISON E. SLEIGHT
PATRICK B. ELLIS
REBECCA M. SMITH
JOSEPH A. LUCAS
ZOE S. MARTINEZ
JACOB S. DUNLOP
STEPHANIE D. MYOTT
KEVAN W. VENTURA

161 Ottawa Avenue NW, Suite 600

Grand Rapids, MI 49503-2793

Phone 616.235.3500  Fax 616.233.5269

RhoadesMcKee.com

GRAND RAPIDS – GRAND HAVEN

March 4, 2013

OF COUNSEL
DALE W. RHOADES
F. WILLIAM MCKEE
ARTHUR C. SPALDING
CHARLES T. ZIMMERMAN
ROBERT F. WILLIAMS
JAMES M. FLAGGERT
TERRENCE L. GROESSER

Mr. Robert Hill
Complex Director
AIG Claims Inc
Complex Casualty Claims
PO Box 3780
Alpharetta, GA 30023
*Robert.Hill2@AIG.com*

Re:     *City of Carmel, IN v Steel Supply & Engineering Co, et al*
        Your Insureds:    Armada Group Inc. and Steel Supply & Engineering Co
        Your Policy:      GL 390-10-97 (04/01/09 – 04/01/10)
        Your Claim No:    302-021754
        Our File No:      49691-13

Dear Mr. Hill,

        This office represents Steel Supply & Engineering Co, and we are writing to respond to your correspondence dated January 22, 2013 and addressed to Mr. James Polonczyk.

        In your letter, you state that you have concluded your coverage investigation and have determined that there is no coverage for the claims asserted against Steel Supply by the City of Carmel in the above-referred to litigation. You then proceed to set forth the facts as you understand them to be followed by the identification of exclusions to coverage which you assert are applicable and operate to exclude coverage for the claims. Missing from your correspondence is any analysis concerning why you take the position that the exclusions apply to the claims asserted against Steel Supply, and we would respectfully request that you reconsider your position that the policy coverage does not apply.

        While your correspondence mentions the June 8, 2009 discovery by one of the iron workers that "one of the steel webs" had failed, your correspondence does not address each of the alleged defects set forth in paragraph 24 of the complaint. In paragraph 24, the City of Carmel alleges:

Exhibit A

Rhoades McKee PC

Mr. Robert Hill
March 4, 2013
Page 2

24. On or about June 8, 2009, defects were discovered within the Project. Specifically, a fissure, or rip, in the structural steel tension ring supporting the dome of the Palladium (the "Defects") was discovered. The Defects included, but were not limited to:

a.   a fracture of the column web at the raker beam-to-tension ring connections;

b.   improper use of bearing bolts in combination with slotted holes in the direction of axial force at the raker beam and connections and the tension ring beam-to-column connections;

c.   improper use of bearing bolts in combination with slotted holes in the direction of axial force at the secondary beams used to brace the raker beams laterally;

d.   improper substitution of a circular compression ring in lieu of a segmented compression ring as depicted on the structural drawings; and

e.   eccentricity introduced in the raker beam-tension ring-column joint due to selection of the work point at the center of the column.

An insurer's duty to defend is broader than the duty to indemnify. If the allegations in the complaint even arguably come within the policy coverage, the insurer must provide a defense. *Polkow v Citizens Ins. Co.*, 438 Mich 174, 178 (1991).

An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy. *Dochod v Central Mutual Ins. Co.*, 81 Mich App 63 (1978). The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look beyond the third party's allegations to analyze whether coverage is possible. *Shepard Marine Construction Co. v Maryland Casualty Co.*, 73 Mich App 62 (1976). In case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor. *Fourteen Couch, Insurance,* 2d (*rev ed*), §51:45, p. 538 [now §51:49, p. 489].

Exhibit A

Rhoades McKee PC

Mr. Robert Hill
March 4, 2013
Page 3

*Protective National Ins. Co. v City of Woodhaven*, 438 Mich 154, 159 (1991), quoting *Detroit Edison Co. v Michigan Mutual Ins. Co.*, 102 Mich App 136, 142 (1980).

As you can see from the paragraph of the complaint quoted above, the City of Carmel alleges that a fissure, or rip, in the structural steel tension ring supporting the dome of the Palladium was discovered. According to the complaint, that fissure, or rip, was the result of the failures or defects identified in subparagraphs (a) through (e) of paragraph 24.

In your letter, you point out that the insuring agreement of the policy provides coverage for "property damage" only if it is caused by an occurrence and state simply that "the alleged injuries to the steel were not caused by an "occurrence." The question, though, remains: Why was the injury to the steel not caused by an "occurrence?" The policy defines "occurrence" as meaning "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." It seems beyond dispute that the fissure or rip as alleged in the complaint was accidental or caused by accident and is, therefore, caused by an occurrence within the meaning of the policy.

You raise Exclusion j(5) which excludes coverage for "property damage" to "that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations." There are three important aspects to this exclusion. First, it uses the present tense and requires active performance of operations. Second, it applies only to a "particular part of real property" upon which those operations are being performed. Lastly, the property damage must arise from those operation being presently performed on that particular part of real property. The complained of fissure or tear simply did not arise from operations being then performed on the structural steel tension ring or that particular part of real property.

Exclusion j(6) is similar and excludes coverage for property damage to "that particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it." Again, and significantly, the exclusion is limited to "that particular part of property," and requires that Steel Supply's work be incorrectly performed on that particular part of property.

Exclusion k excludes coverage for "property damage" to "your product." However, "your product" is defined to mean "any goods or products, other than real property. . ." The exclusion does not apply since all of the alleged property damage is to real property.

Lastly, Exclusion l excludes coverage for "property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." However, this exclusion cannot apply because the work was performed by subcontractors and there is an exception to this exclusion "if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."

Rhoades McKee PC

Mr. Robert Hill
March 4, 2013
Page 4

In conclusion, we strongly believe that Illinois National has a duty to defend Steel Supply in the above-referred to litigation. None of the exclusions relied upon by you in your January 22, 2013 correspondence operate to exclude coverage for all claims brought by the City of Carmel, and it simply cannot be said that coverage is impossible for every claim asserted in the complaint.

Accordingly, we request that you reconsider your coverage determination, and if you continue to maintain that there is no duty to defend, we ask that you provide the factual basis for that position and explain specifically how each exclusion or coverage defense applies.

Very truly yours,

RHOADES McKEE PC

Gregory G. Timmer

GGT:ggt



AIG Property Casualty
Complex Casualty Claims
PO Box 2430
Alpharetta. GA 30023-
2430
www.aig.com

Robert K. Hill
COMPLEX DIRECTOR
T 925 901 2213
F 866 270 7545
Robert.Hill2@AIG.com

March 21, 2013

**VIA EMAIL**

Mr. Gregory G. Timmer
Rhoades McKee PC
161 Ottawa Avenue NW, Suite 600
Grand Rapids, MI 49503-2793
ggtimmer@rhoadesmckee.com

RE:   *City of Carmel, IN v. Steel Supply & Engineering Co., et al.*

Insured:      Armada Group Inc. / Steel Supply & Engineering Co.
Policy:       GL 390-10-97 (04/01/09 – 04/01/10)
Claim No.     302-021754

Dear Mr. Timmer:

Thank you for your March 4, 2013 letter. As you know, Chartis Claims Inc. (formerly known as AIG Domestic Claims, Inc.), a member company of Chartis Inc., is the authorized representative of Illinois National Insurance Company ("Illinois National") which issued Policy No. GL 390-10-97 for the April 1, 2009 to April 1, 2010 period (the "Policy") to the Armada Group Inc. ("Armada"). It is our understanding that Steel Supply & Engineering Co. ("SSE") is a subsidiary of Armada, and therefore a Named Insured under the Policy. In your March 4, 2013 letter, you advised that you represent SSE as their insurance coverage counsel, and are requesting on behalf of SSE that Illinois National reconsider the coverage position asserted in my letter dated January 22, 2013. Please allow this letter to respond to your March 4, 2013 letter.

We have carefully evaluated your March 4, 2013 letter, the current claims against SSE and the Policy provisions. We regret to inform you that, despite reconsideration, Illinois National must still maintain the coverage position asserted in my January 22, 2013 coverage letter. Illinois National will no longer fund SSE's defense, will not pay any amounts towards any settlement, and will not indemnify SSE for any judgments entered against it, based on the current allegations.

Please see my January 22, 2013 letter for a summary of the allegations in the underlying lawsuit and other pertinent information provided by SSE

Page 1 of 4
March 21, 2013

Exhibit A



to Illinois National. As noted therein, Illinois National must respectfully deny coverage for this matter under the Policy for the following reasons.

The Insuring Agreement of the Policy provides coverage for "property damage" only if it is caused by an "occurrence." Based on the allegations and the facts provided to us, the alleged injuries to the steel were not caused by an "occurrence" as defined by the Policy. Under the applicable law, when the damage arising out of an insured's defective workmanship is confined to the insured's own work product, the insured is the injured party, and the damage cannot be viewed as accidental within the meaning of the Policy. You specifically cite in your March 4, 2013 letter to the paragraph of the complaint which alleges that the damages were to the structural steel tension ring supporting the dome of the Palladium. As SSE was responsible for fabricating all the structural steel on the project, such damages to the structural steel tension ring constitute damages to SSE's own product. Therefore, as all of the alleged "property damage" to the steel did not arise out of any "occurrence," the alleged remediation costs for the steel and any alleged consequential damages flowing therefrom are not covered under the Insuring Agreement of the Policy.

Also, if there were an "occurrence," several exclusions would then clearly apply. First, Exclusion j(5) of the Policy excludes coverage for "property damage" to "that part of real property on which you or any contractors or subcontractors... are performing operations, if the "property damage" arises out of those operations." In the present case, SSE and its subcontractors were performing operations at the Palladium via fabrication and erection of the structural steel for the Palladium dome components. The Claimant alleges that any "property damage" which subsequently resulted arose directly out of SSE's work at the Palladium. Contrary to your assertions in your March 4, 2013 letter, under the applicable law, Exclusion j(5): (a) does *not* contain a limiting temporal element requiring that the work still be in progress at the time the property damage occurred; and (b) excludes coverage to damages done to *any* land or other property that the insured physically performed operations on. Therefore, as any "property damage" arose out of SSE and its subcontractor's operations at the Palladium, Illinois National must deny coverage for all claims as currently pled in the underlying litigation pursuant to Exclusion j(5) of the Policy.

In addition, Exclusion j(6) of the Policy excludes coverage for property that must be restored, repaired or replaced because "your work" was incorrectly performed on it, with the exception that it does not apply to "property damage" included in the "products-completed operations

Page 2 of 4
March 21, 2013

Exhibit A



hazard." The Complaint alleges that "property damage" occurred and remediation efforts took place because of SSE's incorrectly performed work at the Palladium. SSE's general counsel advised Illinois National counsel on January 14, 2013 that SSE was not entirely finished with its work at the time the alleged injuries were discovered. Similar to Exclusion j(5), under the applicable law, Exclusion j(6) also broadly extends to *any* real property on which the insured performed work. Thus, to the extent that SSE's work at the Palladium was incomplete at the time of the property damage, Illinois National must deny coverage for all "property damage" associated with "your work" pursuant to Exclusion j(6) of the Policy.

Moreover, Exclusion k of the Policy excludes coverage for "property damage" to "your product." All of the allegations of physical injuries to the structural steel at the Palladium constitute allegations of "property damage" to "your product" (SSE's "product" constitutes the steel SSE fabricated for the Palladium). Thus, Illinois National must deny coverage for any "property damage" to the structural steel at the Palladium.

Finally, Exclusion l of the Policy excludes coverage (in the alternative to Exclusion j(6)) for "property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". SSE's "work" constitutes the fabrication of the structural steel for the Palladium, which SSE has advised was *not* subcontracted out to other parties. Thus, to the extent that "your work" at the Palladium was in fact complete at the time of the "property damage", Illinois National must deny coverage for "property damage" to all the steel at the Palladium pursuant to Exclusion l of the Policy.

As advised in my January 22, 2013 coverage letter, there may be other provisions in the Policy that also obviate coverage under the Policy. Illinois National does not waive any rights or defenses under the Policy and/or applicable law.

Illinois National's coverage position is based on the information presently available to us. This letter is not and should not be construed as a waiver of any terms, conditions, exclusions or other policy provisions, or any other potential coverage defenses Illinois National may have under the Policy. Should SSE have any additional information that it believes should cause Illinois National to review its position, please advise me as soon as possible. Additionally, in the event that an amended complaint is filed in this matter in the future which SSE believes may trigger coverage, please forward it to Illinois National for consideration.



There may be coverage for this matter under other insurers' policies, whether directly or by way of an additional insured endorsement. Accordingly, we recommend that you notify any such carriers immediately of this matter.

In closing, I encourage you to contact me should you have any questions or concerns regarding the contents of this letter. Thank you for your cooperation in this matter.

Very truly yours,

AIG Claims Inc

for Illinois National Insurance Company

*Robert Hill*

Auto signature

Robert Hill

Complex Director

E-mail: Robert.Hill2@aig.com

Cc:     Bryan Schumann, Esq. (via email)
        James Polonczyk, CFO & General Counsel of The Armada Group, Inc.
        (via email: jpolonczyk@the-armada-group.com)

Page 4 of 4
March 21, 2013

Exhibit A

STATE OF INDIANA       )             IN THE HAMILTON SUPERIOR COURT

                       ) SS:

COUNTY OF HAMILTON  )           CAUSE NO. 29D01-1106-PL-5285

CITY OF CARMEL, INDIANA, by the     )
CARMEL REDEVELOPMENT COMMISSION,  )
                             )
          Plaintiff,               )
                             )
        v.                       )
                             )
STEEL SUPPLY & ENGINEERING CO. and    )
OHIO FARMERS INSURANCE COMPANY,    )
                             )
          Defendants.          )

## AMENDED COMPLAINT

Plaintiff, the City of Carmel, Indiana, by and through the Carmel Redevelopment Commission (the "CRC"), by counsel, for its Amended Complaint against Defendants Steel Supply & Engineering Co. ("SSE") and Ohio Farmers Insurance Company (the "Surety") (collectively, the "Defendants"), alleges and states as follows:

### PARTIES

1.    The City of Carmel, Hamilton County, Indiana ("Carmel"), pursuant to Indiana Code Section 36-7-14-3, established the CRC as a five-member commission to ensure that all redevelopment projects funded through special benefit taxes would benefit all taxable property within the boundaries of Carmel and would further enhance the development of Carmel.

2.    Pursuant to Indiana Code Section 36-7-14-12.2, the CRC has broad powers to, among other things, acquire, hold and develop real property, retain experts, engineers, architects, surveyors, contractors and legal counsel, and initiate civil actions in the name of Carmel.

8

Exhibit A

3.     SSE is a corporation organized under the laws of the State of Michigan and conducts business in the State of Indiana, including Hamilton County.

4.     SSE, by and along with its subcontractors, details, designs, fabricates, erects, retrofits and installs structural steel for construction projects.

5.     Upon information and belief, SSE's past projects include stadiums, healthcare facilities, schools, museums, and manufacturing complexes.

6.     The Surety is an Ohio insurance and  surety bond corporation, which conducts business in the State of Indiana.

## THE PROJECT

7.     The CRC authorized the design and construction of the Regional Performing Arts Center – the Palladium – in Carmel, Hamilton County, Indiana (the "Project").

8.     The Project's purpose is to serve as the performance home for several local resident performing arts organizations, to serve as the venue for the finest performing artists from around the world, and to develop an arts education program to interact with the community.

9.     The Project includes three venues:  the Palladium, the Tarkington Theater, and the Studio Theater.  The various defects at issue in this dispute, described in detail below, pertain to the Palladium only.

## THE CONTRACT DOCUMENTS

10.     The CRC entered into agreements with numerous prime contractors for completion of various aspects of the Project.

11.     The prime contractor selected by the CRC who was responsible for the design, detail, fabrication and erection of structural steel and connections on the Project was SSE.

Exhibit A

12.     As such, SSE, along and in conjunction with its subcontractors, was the fabricator, connection designer, detailer, and erector of the structural steel for the Project.

13.     On or about January 8, 2008, the CRC and SSE entered into an agreement titled Bid Package #3030—Structural Steel, Agreement #2695-3030, for the design, fabrication, and erection of the structural steel to be used on the Project. A true, accurate, and authentic copy of the Bid Package is attached hereto as **Exhibit A**.

14.     Incorporated into this Bid Package is the City of Carmel's Standard General Conditions for Construction Contracts (1997 edition). A true, accurate, and authentic copy of the General Conditions is attached hereto as **Exhibit B**. (The Bid Package and the General Conditions collectively are the "Contract Documents").

15.     Further, incorporated and made a part of the Contract Documents by reference, SSE was also obligated to perform pursuant to the Specifications, the Additional Requirements, the Notice to Bidders, the Instructions to Bidders, the Plans and Drawings, the Performance and Payment Bonds, and certain other Proposals and Declarations, all of which are defined terms set forth in the Contract Documents.

16.     The Contract Documents (with change orders) provided that SSE was to be paid in excess of Ten Million and 00/100 Dollars ($10,000,000.00) for its work on the Project.

### THE FABRICATION TEAM

17.     In order to fulfill its contractual obligations to the CRC to design, detail, fabricate, and erect the necessary steel members and their connections, SSE retained the following subcontractors:

>   a.     Creviston Engineering, Inc. ("Creviston"), as specialty structural engineer, was contracted by SSE to design select steel members and connections

10

and perform the necessary calculations, among other things (*i.e.*, determine how the pieces fit together and create the steel connection plan so that the structure stays upright);

b.  Arcan Detailing, Inc., as steel detailer, was contracted by SSE to draw or render the steel members and connections via computer aided design—CAD—software (*i.e.*, create the blueprint); and

c.  Sofco Erectors, as steel erector, was contracted to raise and connect the steel members (*i.e.*, put the pieces together).

18.  SSE fabricated the steel in house and oversaw this team of subcontractors.

## SSE'S CONTRACTUAL OBLIGATIONS

19.  Pursuant to the Contract Documents, SSE's obligations were extensive.

20.  SSE was obligated to supervise and direct its work on the Project competently and efficiently, devoting such attention as appropriate and required, while applying its skills and expertise as necessary to perform its work in accordance with the Contract Documents.

21.  SSE was required to design connections, detail the structural steel, fabricate the structural steel and erect the structural steel in accordance with the Contract Documents.

22.  SSE was required to obtain and provide competent, suitably qualified personnel to perform the design detailing, fabrication and erection as required by the Contract Documents.

23.  SSE had several and specific obligations regarding the design and fabrication of the structural steel frame connections on the Project.

24.  SSE was responsible for the means, methods, techniques, sequences, and procedures of fabrication and erection for its obligations on the Project.

11

25.     SSE was responsible to see that their portion of the finished Project complied strictly with the Contract Documents.

26.     SSE was required to furnish and assume full responsibility for all materials, equipment, labor, construction equipment and machinery, tools, services, and incidentals necessary for the furnishing, performance, testing, start-up and completion of its designated work on the Project.

27.     SSE was responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with its work performed on the Project.

28.     SSE was fully responsible for all acts and omissions of its subcontractors.

29.     SSE was prohibited from loading any part of the Project in any manner that such loads could endanger the structures.

30.     SSE was obligated to ensure that any and all work performed by SSE's subcontractors on the Project was undertaken pursuant to an appropriate agreement between SSE and the subcontractors, which specifically bound such subcontractors to the Contract Documents.

31.     SSE is required to indemnify and hold harmless the CRC from and against all claims, damages, losses, liabilities and expenses, direct, indirect, and consequential, including, but not limited to, fees and charges of engineers, architects, attorneys, and other professionals, court costs, and arbitration costs, arising out of or resulting from SSE's performance of its work on the Project or from the installation, existence, use, maintenance, condition, repairs, alteration or removal of any equipment or material, provided that any such claim, damage, loss, liability or expense is caused in whole or in part by a negligent act or omission of SSE or any subcontractor retained by SSE.

12

32.     SSE was required to furnish a performance bond in an amount of at least one hundred percent (100%) of the contract price for SSE's work on the Project.

33.     The Surety provided the performance bond for SSE's work on the Project (the "Performance Bond"). A true, accurate, and authentic copy of the Performance Bond is attached hereto as **Exhibit C**.

## RAKER-TENSION-COLUMN CONNECTION DEFECTS

34.     The Palladium contains a large span dome, which is approximately 110 feet in diameter.

35.     The dome roof consists of a steel frame, which is covered by a 12 inch thick precast concrete roof plank system.

36.     The steel framing of the dome is comprised of two semicircular elements that make up the compression ring at the top of the dome and sixteen wide-flange raker (a/k/a radial) beams that connect the top compression ring to the bottom tension ring.

37.     The tension ring is comprised of sixteen horizontal steel members that frame into the top of sixteen wide-flange columns.

38.     The sixteen points at which the raker beams, tension ring members, and columns connect are complex steel connections known as the "Raker-Tension-Column Connections".

39.     A lower section of the domed portion of the building is a cylindrical drum shaped wall that encloses the base of the domed area.

40.     On or about June 8, 2009, certain defects were discovered within the Project at the Raker-Tension-Column Connections.

41.     Specifically, a fissure, or rip, in the structural steel column web was discovered in two of the critical Raker-Tension-Column Connections.    Other Raker-Tension-Column

13

Connections showed signs of distress necessitating remediation (collectively, the "Raker-Tension-Column Connection Defects").

42.     The Project was deemed (and agreed to by all parties) to be facing potential "imminent failure", *i.e.*, there were concerns of a possible structural collapse due to the Raker-Tension-Column Connection Defects.

43.     The Raker-Tension-Column Connection Defects substantially impacted the Project's structural integrity and constituted a significant safety concern, which mandated immediate attention.

44.     As a result, the CRC engaged the renowned civil and structural engineering firm Walter P Moore ("WPM") to diagnose the technical deficiencies and to determine the appropriate processes to remediate the Raker-Tension-Column Connection Defects.

45.     In the course of arriving at measures to address the Raker-Tension-Column Connection Defects, WPM preliminarily identified issues that were factors in causing a fracture of the column web in the Raker-Tension-Column Connections, including:

> a.     the use of bearing bolts in combination with slotted holes in the direction of axial force at the raker beam end connections and the tension ring beam-to-column connections;
>
> b.     the use of bearing bolts in combination with slotted holes in the direction of axial force at the secondary beams used to brace the raker beams laterally, both of which were contrary to the Contract Documents' structural drawings;

14

c.     improper substitution of a circular compression ring in lieu of a segmented compression ring as depicted on the Contract Documents' structural drawings;

d.     the actual design and fabrication methods used introduced an eccentricity into the Raker-Tension-Column Connections due to selection of the work point at the center of the column, which likely exacerbated the above issues; and

e.     the connections were designed by SSE (and its connection design subcontractor, Creviston) for the Raker-Tension-Column Connections without a suitable reinforcement (sometimes referred to as a "stiffener"), which resulted in overstress of the column web causing the Raker-Tension-Column Connection to fail.

46.     Most simply, the forces coming into that critical connection were complicated and significant, and the Raker-Tension-Column Connections designed by SSE were inadequate to handle the forces.

47.     The tension ring, which is akin to a belt holding the downward and outward forces of the dome at bay from extending outward, was being pulled apart and ripping at the Raker-Tension-Column Connections.

48.     SSE and Creviston failed to design the Raker-Tension-Column Connections to withstand these forces, and the connection design was patently insufficient.

49.     The Raker-Tension-Column Connection Defects required extensive remediation in order to resolve the structural integrity of the Palladium and to provide for the safety of those working within and around the Project and for future patrons of the Project.

15

50.     The CRC, through its retained remediation expert, WPM, initiated an extensive repair process to remediate the Raker-Tension-Column Connection Defects.

51.     Among other things, large vertically oriented curved cover plates that passed by the front end of the column web and the ends of which were welded to the top and bottom flanges of the tension beams, in order to restore a load path for the forces, were added to the Raker-Tension-Column Connections to properly support the necessary forces at great expense and time.

52.     In addition to the damages related to the immediate steel remediation "fix" performed in 2009, the subsequent delay from the Raker-Tension-Column Connection Defects and remediation disrupted the normal scheduling of the various trades working on the Project because there was a shortened window for all the contractors to complete their portion of the Project, further disrupting and compromising the Project.

53.     Various contractors working on the Project put the CRC on notice of claims for damages that they sustained as a result of the Defects and delays (the "Contractor Claims").

54.     The CRC has suffered damages in responding to, defending, and settling some of the Contractor Claims.

55.     The Raker-Tension-Column Connection Defects and the Contractor Claims have caused and will continue to cause the CRC to suffer substantial economic and non-economic damages not yet capable of precise calculation, but which is approximately Six Million One Hundred Thousand and 00/100 Dollars ($6,100,000.00).

56.     Ultimately the remediation associated with the Raker-Tension-Column Connection Defects and the other aspects of the construction of the Project were completed.

16

57.    Once completed, the Project has become a lasting and iconic aspect of the Carmel community.

58.    The Project has been heralded as a landmark for listening for its acoustical precision and architectural style, and is intended to be a cornerstone of the Carmel community for hundreds of years to come.

## TRUSS DEFECTS

59.    However, during the course of litigation, on or about January 30, 2013, counsel for Defendants contacted the CRC's counsel to make them aware of certain additional defects that SSE's retained expert had discovered that were separate and unrelated to the original Raker-Tension-Column Connection Defects.

60.    Specifically, SSE's expert had located defects associated with the six trusses within the domed roof of the Project: T1A, T1B, T2 (two instances), T3 and T4 (collectively, the "Truss Defects").

61.    The CRC and WPM performed an exhaustive analysis and confirmed the existence of the Truss Defects, which required remediation in the form of retrofits.

62.    The truss retrofits are ongoing.

63.    In remediating the Truss Defects, the CRC has sustained additional damages in the form of labor and material costs, expert and legal fees, and other expenses that are not yet capable of precise calculation, which are to be determined at trial.

## POST BOLT DEFECTS

64.    Following the discovery of the Truss Defects, the CRC engaged WPM to perform a shop drawing review of all structural steel connections on the Project to determine whether any additional defects may exist in SSE's work on the Project.

17

65.     To that end, in performing this peer review, WPM located additional defects in May 2013, which were separate and unrelated to the Truss Defects or the Raker-Tension-Column Connection Defects.

66.     These additional issues related to the posts in eight locations above truss T2.

67.     The shop drawings show four three-quarter inch bolts at these connections.

68.     Preliminary calculations suggest that these bolts are inadequate to carry the required load (the "Post Bolt Defects").

69.     In order to determine whether and to what extent a retrofit remediation of the Post Bolt Defects is necessary, the CRC is compelled to expose the connections to verify the actual as-built condition of these eight connections.

70.     In investigating and potentially remediating the Post Bolt Defects, the CRC has sustained additional damages in the form of labor and material costs, expert and legal fees, and other expenses that are not yet capable of precise calculation, which will be established at trial.

71.     WPM's peer review of the Project is ongoing and may result in additional defects being located.

72.     The Raker-Tension-Column Connection Defects, the Truss Defects, and the Post Bolt Defects collectively are the "Defects."

## COUNT I
## BREACH OF CONTRACT

73.     The CRC incorporates by reference the previous paragraphs as if fully set forth herein.

74.     The CRC fully performed its obligations under the Contract Documents and satisfied all conditions precedent required thereby.

75.     SSE is bound to the terms of the Contract Documents.

18

76. SSE breached numerous provisions of the Contract Documents and was the cause of the Defects.

77. SSE failed to confirm that its work was performed in compliance with the Contract Documents and relevant regulations, as evidenced by the Defects.

78. SSE failed to supervise and direct its work on the Project competently and efficiently, as evidenced by the Defects.

79. SSE failed to deliver a facility that was safe for occupation due to the Defects in connection with its work performed on the Project.

80. Perhaps most essential to the various Defects outlined here, SSE was obligated to retain subcontractors who were skilled and experienced such that the connection of the steel members would be satisfactorily designed and all the structural steel would be detailed, fabricated, and erected by such entities in accordance with the Contract Documents.

81. However, SSE failed to fulfill its contractural obligations in that the connections designed were woefully inadequate and the subcontractors hired were under-skilled and without sufficient experience.

82. Worse yet, the sole employee of Creviston, Jack Creviston, P.E., lacked staffing capability and resources to execute the Project of this nature, size and complexity with acceptable results.

83. In addition to not devoting satisfactory care and attention to the connection designs that failed, Creviston had never worked on a project even remotely close to the complexity of the Palladium.

84. SSE had the responsibility to design the connections that failed.

19

85.     SSE failed to understand the scope and complexity involved in the connection design, detailing and fabrication of the dome structure.

86.     SSE had the obligation to design, detail, fabricate the steel on the Project. To do this, SSE retained Creviston and the remainder of the Fabrication Team. However, SSE and its team were unprepared for the task before it and grossly under-designed the key connections that failed, resulting in the Defects.

87.     SSE, along with its subcontractors, is the cause of the Defects.

88.     The CRC has suffered damages as a result of the Defects and will suffer additional damages as a result of SSE's numerous breaches and is further entitled to indemnification from SSE for all damages the CRC incurs as a result of SSE's breaches.

89.     The CRC is entitled to direct, indirect and consequential damages, including, but not limited to, engineers', architects', attorneys' and other professionals' fees incurred in connection with the Defects and the prosecution of this dispute.

WHEREFORE, the CRC prays for a judgment in its favor and against SSE in an amount sufficient to compensate the CRC fully for its damages, including, but not limited to, direct, indirect and consequential damages, engineers', architects', attorneys' and other professionals' fees and for all other proper relief.

## COUNT II
## BREACH OF WARRANTY

90.     The CRC incorporates by reference the previous paragraphs as if fully set forth herein.

91.     SSE is liable to the CRC under any and all express and implied warranties that it issued, including, but not limited to, warranties for a particular purpose, warranties of

20

merchantability, any and all statutory warranties, and any all warranties recognized by the Contract Documents and common law.

92.    SSE breached these warranties as a result of the Defects.

93.    As a proximate cause of SSE's breach, the CRC has suffered substantial damages and will suffer additional damages.

94.    CRC is entitled to damages as a result of SSE's breach of these warranties.

WHEREFORE, the CRC prays for a judgment in its favor and against SSE in an amount sufficient to compensate the CRC fully for its damages, including, but not limited to, direct, indirect and consequential damages, engineers', architects', attorneys' and other professionals' fees and for all other proper relief.

## COUNT III
## CLAIM FOR PAYMENT BY SURETY

95.    The CRC incorporates by reference the previous paragraphs as if fully set forth herein.

96.    In addition to recovering against SSE, the CRC is entitled to judgment against the Surety as it is vicariously liable for the acts and omissions of its principal, *i.e.*, SSE, under the Performance Bond entered into between the CRC, SSE and the Surety on January 8, 2008, which is attached hereto as Exhibit C.

97.    The Performance Bond incorporates by reference the Contract Documents outlining the responsibilities of the CRC and SSE in the construction of the Project, and provides that the Surety is bound to satisfy SSE's indebtedness to the CRC for all liabilities related to the Project.

98.    SSE breached numerous provisions of the Contract Documents as a result of the Defects.

21

Exhibit A

99. The CRC fully performed its obligations under the Contract Documents and the Performance Bond and satisfied all conditions required therein.

100. The CRC put SSE and the Surety on notice of the Defects and its claim for indemnity.

101. SSE is liable to the CRC for damages related to SSE's acts or omissions on the Project, including the Defects.

102. SSE has failed to pay the CRC for its damages incurred as a result of SSE's breach of the Contract Documents and the Defects.

103. As a result, the CRC is entitled to satisfaction of such damages from the Surety pursuant to the Performance Bond.

WHEREFORE, the CRC prays for a judgment in its favor and against SSE and the Surety in an amount sufficient to compensate the CRC fully for its damages, including, but not limited to, direct, indirect and consequential damages, engineers', architects', attorneys' and other professionals' fees and for all other proper relief.

22

Exhibit A

Respectfully submitted,

_____

Robert S. Schein, Atty. No. 20357-49
KRIEG DeVAULT LLP
12800 North Meridian Street, Ste. 300
Carmel, Indiana 46032
(317) 636-4341; FAX: (317) 636-1507
rschein@kdlegal.com

and

Thomas J. Costakis, Atty. No. 4314-49
Bryan S. Strawbridge, Atty. No. 29076-49
KRIEG DeVAULT LLP
One Indiana Square, Suite 2800
Indianapolis, Indiana 46204
(317) 636-4341; FAX: (317) 636-1507
tcostakis@kdlegal.com
bstrawbridge@kdlegal.com

Attorneys for the Plaintiff, City of Carmel,
Indiana, by the Carmel Redevelopment
Commission

23

Exhibit A

## CERTIFICATE OF SERVICE

     The undersigned hereby certifies that a copy of the foregoing Amended Complaint has been served upon the following counsel of record by depositing a copy of the same in the United States mail, first class postage prepaid, this 10th day of June, 2013.

     Steven E. Springer
     Pfenne P. Cantrell
     KIGHTLINGER & GRAY, LLP
     One Indiana Square, Suite 300
     Indianapolis, IN 46204
     sspringer@k-glaw.com
     pcantell@k-glaw.com

                                   _____
                                    Robert S. Schein

KD_5191098_1.DOC

24

Exhibit A